starting. Thank you. Hear ye, hear ye. All persons having business with the Honorable the United States Court of Appeals for the Ninth Circuit will now draw near. Give your attention and you will be heard. God save these United States and this Honorable Court. Good morning and welcome to the Ninth Circuit Court of Appeals. My name is Morgan Christens. I'm one of the judges on the Circuit Court and we're here today virtually gathered for an oral argument. I need to start with a sound test if you don't mind. I'll just start first. Judge Piaz joining us from Pasadena, I believe, today. I can see you, Judge Piaz. Can you see and hear me? Great. Okay. And Judge Desai? Good morning. Good morning. So I can see and hear you too. I can see two lawyers. Gentlemen, could I just get thumbs up if you can see and hear us okay? Looks like. Thank you. Good morning to both of you. We'll go this is a time set for oral argument in Foucault versus Trump. That's case 25-4249. We previously issued an order in this case and have been asked to reconsider it, an order denying a motion for stay pending appeal and merits appeal of the preliminary injunction from the district court. With that, I am ready and I think my colleagues are ready to hear argument from counsel. Please the court that Yakov Roth on behalf of defendants. I'm going to try to reserve a couple of minutes for rebuttal. Sir, could I get you to speak up or get closer to your microphone? Is that better, Your Honor? A little, but you're going to have to keep your voice up, I think, sir. Thank you. All right. May it please the court, Yakov Roth on behalf of defendants, and I'm going to try to reserve a couple of minutes for rebuttal. Thank you for hearing from me a second time in this case. I do realize that the court addressed largely the same issues at the stay stage, but I'm going to try to convince the court to resolve them differently now, in part based on some intervening authority from the Supreme Court and in part based on different standards that apply at the stay stage. So as to the intervening authority, that relates to the Tucker Act preclusion issue. Because the court knows after the stay order was issued, the Supreme Court decided the NIH case, which granted a stay of a very similar injunction on the ground that the Tucker Act precludes APA claims, challenging grant terminations as arbitrary and capricious. And in light of NIH, the plaintiffs in their merits brief, no longer defend the rationale from this court stay order. They appear to concede that if the University of California as the contracting party had tried to bring these very claims in district court, those would have been precluded, the University of California would have had to go to the federal claims to seek money damages. And so if plaintiffs have brought their APA claims, or bring their APA claims challenging the form termination in the Court of Federal Claims, would you concede jurisdiction in that court? Well, they wouldn't be APA claims in the Court of Federal Claims, they would be contract claims. And they were talking about the researchers, so not not the grantees, the researchers, which are the plaintiffs in this case. If they were to bring claims in the Court of Federal Claims, your position would be that they that those claims couldn't be heard there, because in fact, they are not contracted parties. They're not, they're not parties to the contract. Is that correct? I think that's probably what we would argue in that case. Okay, so is it your position that no court has jurisdiction over plaintiffs APA claims? Yes, no court has jurisdiction over these plaintiffs claims because these plaintiffs claims are actually disguised breach of contract claims. That's the rationale of NIH and the Tucker Act limits both who can sue for those claims, where they can sue and the relief they can get. And so, for example, if the University of California had come to the district court and said, we don't like the breach of, you know, we think these contracts were breached or terminated improperly, and we want specific performance and we can't get that from the Court of Federal Claims, they can only give us money damages. So you can't send us there. We have no ability to get that relief there. That would not work. This court rejected exactly that argument in North Star, Alaska. Point is, so I guess my question with and I understand your argument with respect to the universities and their ability to bring either the contract claims under the Tucker Act in the Court of Federal Claims and perhaps other claims for non-monetary damages, perhaps elsewhere. What I'm interested in is for this particular class of plaintiffs, which are not the universities, but are the researchers, if it's your position that no court has jurisdiction over their APA claims, then what do we do with our recent holding in community legal services where we held that a district court cannot be deprived of jurisdiction by the Tucker Act when no jurisdiction lies in the Court of Federal Claims? So let me first address our position, sort of make clear our position, and then I'm happy to talk about community legal services. So first, to be clear, yes, our position is these plaintiffs cannot bring these APA claims anywhere. The only claims that can be brought are the claims that are cognizable under the Tucker Act in the Court of Federal Claims. And we think it would be very strange and counterintuitive if the contracting parties were limited to damages relief only under the Tucker Act in the Court of Federal Claims, they couldn't come in and get a reinstatement order anywhere. Be very strange if third parties who are further removed from the contract could evade all of those limits and actually get a reinstatement order of the grants by coming to federal district court. We think that's sort of the whole point of the implied preclusion principle under the APA is to prevent circumvention of the limits that apply under specialized review schemes like the Tucker Act. And we think the Supreme Court decision in block is right on point for this. The court there said when a statute provides a detailed mechanism for judicial consideration of particular issues at the behest of particular persons, judicial review of those issues at the behest of other persons may be found to be impliedly precluded. And in fact, they said it was impliedly precluded there. And we think that principle applies equally here in terms of community legal services, the principle rationale and sort of the starting point of the analysis that the court gave in that case was that they weren't contract claims at all, not because they weren't styled as contract claims, but the court said the thrust of the argument and the claim there was that the agency had a statutory and regulatory duty to provide certain funding services and funding for those services. And it wasn't doing it. And the court said that you could bring that claim whether there was any contract, no contract, the contract is irrelevant. Your claim is that they have a duty under the statute to provide services and they're not providing them. Which is why NIH, which is why NIH isn't in conflict with community legal services. They're not contract claims there. Is that that's the government's concession today? Yes. Well, to be clear, I don't think we agree with community legal services, but we also think this case is much closer to NIH than it is to community legal services. My question was that the government agrees that the claims there and the premise of community legal services is that they weren't contract claims at all. Yeah, that's how I, yes, that's how I read that opinion. All right. I just wanted to clarify your position today. Thank you. Mr. Roth. So when, you know, NIH, there was a concurrence by Judge Barra. And I seem to, when I read her concurrence carefully, she seemed to hedge a bit about whether or not what she would do in the event that one of the parties could not bring a claim in the court of federal claims. So in other words, if they had no, no position or no right to bring a claim in the court of federal claims, you just suggested that these plaintiffs would be unsuccessful at the get go. What do we take from Justice Barrett's concurrence? Well, I'm not sure which part of the concurrence your daughter is referring to. What I recall from the concurrence was that Justice Barrett was distinguishing challenges to the termination of a grant from prospective challenges to an agency guidance or, you know, other sort of document that dictates policy going forward. And she said, if you're just challenging a policy decision that's prospective, that's a standard APA claim. But if what you're asking for is reinstatement of a grant that was terminated, that is a contract claim, whatever you style it. And that has to go to the court of federal claims. I think both my colleagues are getting at the same point, which is that there's a strong presumption of reviewability and judge decides question. I think that the government all but conceded. And today I think you've taken last time and I think you've taken the position this time that these folks, these plaintiffs could not bring this claim in the court of federal claims. And so with that in mind, could you circle back to Judge Pius's question? Yeah, Your Honor. Yes, Your Honor. It's very important. There is reviewability, but there is reviewability at the behest of certain persons, contracting parties, intended third party beneficiaries. That's the principle of the Tucker Act under court of federal claims precedent. And as in block, if the statute allows for review by certain people, that doesn't mean everyone else gets to go around it and go to federal court and actually get more than the contracting parties can get. I mean, the difficulty that I'm having with this argument is that the Supreme Court in its NIH decision could have but didn't make this distinction. So where there is a group of plaintiffs that included both grantees and researchers, there was no discussion about the. The researchers and what would happen to their claims if they were to try to bring those in the court of federal claims. And so the sort of absence of any direction with respect to those individuals leaves me to think that the court simply did not address that issue and sort of broadly characterize the plaintiffs as only those that had contract claims that could be brought in the court of federal claims. Your Honor, I don't disagree that the NIH orders don't specifically address this issue. It's true that the plaintiffs in NIH fell into both categories, and the court didn't issue a stay only as to one group and not the other. So I'm not sure that you would read into it that the plaintiffs are right as opposed to that we're right or just that the court didn't address it. I do think the court addressed it in block, and I do think this court addressed virtually the same question in North Star Alaska with respect to the remedial limit. I don't see a big difference between the remedial limits of the Tucker Act, which the court said you can't evade by going through the APA and who can bring suit limits of the Tucker Act, but you also should not be able to evade. Go ahead. Finish up. No, that's fine. Mr. Roth, let me ask you this. Do you read the plaintiff's complaint as challenging a policy? No, I don't think so. I don't. There is a policy that they're challenging. They're challenging. And the injunction they got is an injunction vacating the terminations of the grants and requiring those grants to be turned back on. Doesn't each one of each one of the agencies after the executive orders were issued sort of adopt a policy implementing the executive orders? I don't know, Your Honor, if they did or didn't, but that's not what the injunction enjoins or vacates. So the injunction says you got to turn the grants back on. And under Justice Barrett's controlling concurrence, those are the claims that have to go through the Tucker Act process. Well, if they're challenging the underlying policy of implementing that led to the termination of the grants, it seems to me that they would be able to pursue those claims at a minimum in the district court. Yeah. Isn't that right? If there's a policy document, they could challenge a policy and say you have a policy of terminating DEI related grants. We think that policy is arbitrary and capricious. It should be vacated going forward. They could bring that claim. But Justice Barrett says that would not lead to the reinstatement of particular grants that had been terminated. That's her whole kind of point in the concurrence was that those are separate things. If that's the relief you want, then you have to go to the Court of Federal Claims. And that is the relief they got here. Well, as I read her concurrence, she contemplates proceedings in two different courts. Right. Right. It's kind of odd, but that's. Yeah. I mean, yeah, she does. The follow up question. Sir, could I ask if I'm just mindful of the clock here? Yes. I'd like to ask a follow up question regarding Judge Piazza's question about whether this was an attempt to challenge a policy. Your briefing repeatedly says that what the government was doing here was terminating programs. And I'm looking for in the record for any program that was eliminated. Can you point me to one? They were terminating grants. They were all terminating programs. There was no program that was exactly. There was no grant. So what I read the record to be doing, and I think this is a very important point, at least for me, is that a number of grants were targeted for termination on a specific criteria. And we have a record about what that criteria was and that those grants appeared across a swath of programs. Yes, that's right. And the programs were not terminated. That's right. All right. Can I shift your focus just a bit to the injunction itself? So in your motion for reconsideration, you say the court needs to reconsider what the district court did in terms of granting an injunction with respect to the form termination class. Now, the district court said that the two classes that she identified and certified, that they're overlapping classes. Right. So that led me to think that though some of these form termination class terminations, members of that class may have been, their grants may have been terminated on the basis of, let's just say, DOJ efficiency matters. It also suggests that some of those grants were also terminated for DEI reasons. If we would agree with you that NIH requires that the injunction be modified, how would the district court fashion relief along those lines? What would you suggest? Well, I think the district court would have to figure out who's a member of class A and who's a member of class B. And if you're a member of either, right, if you're a member of both, then it wouldn't help us to just get rid of the APA claims. We also have to get rid of the First Amendment claims. So I agree with your honor that I need to take on the First Amendment piece and with the clock running, I will turn to that if your honor permits. Sure. Because I was just wondering, you know, how would the district court fashion relief? I think the relief would be if the court said that the form termination class claims, APA claims are precluded, we would be left with the First Amendment class and an injunction that covered the grants that had been terminated for members of that class. So it would be a different group. Now we would have to figure out who's in one or the other, but we have to do that, I think, anyway, in order to comply with the injunction hasn't hasn't been a problem. That I'm aware of. Okay, but let me address the First Amendment on the merits because part of the reason we didn't press the Tucker Act argument on the First Amendment claims because we think the First Amendment claims are so without merit that it's easier to address them on the merits. I understand the plaintiff's theory to be that the government cannot terminate grants based on viewpoint, which if true means that the executive orders are in relevant part unconstitutional. And I think that really has to be wrong. So imagine we're the National Science Foundation, and I get two grant applications, and one is to research how to help kids stop smoking, and the other is to research health benefits of  The First Amendment does not require NSF to treat those two applications equally. NSF can say pro smoking research is not our priority. We're not going to fund it. And that's not a first. That's clearly viewpoint discrimination. It is not a violation of the First Amendment. I don't think that's any different from the EPA saying we're not interested in funding climate justice anymore, or the NEH saying we're not interested in funding DEI related research anymore. They're not saying you can't do the research. Can I interject right there? That's why I asked the question about the programs. That's not what happened here. There wasn't any termination of a program of the kind you're describing. That's not what these decisions were. The record shows that these programs continued. The programs continued, but the specific grants were targeted for termination within those programs are right. So I agree with your honor, but I don't understand why that matters. So it matters because once they decide to fund, they can't discriminate on the basis of viewpoint. DEI, as we talked about last time, I don't take a lot of your time. You're shaking your head. No, but if you could listen to my question, I would appreciate it. DEI is inherently directional, right? When the government's brief, and this is a sub question, maybe you can clear up for me and you're going to have plenty of time. It's a very significant case, and we'll give, of course, the time that is required. So don't worry about that. Thank you. But DEI is inherently directional. So one thing as a premise, it would be helpful to me to understand when the government, you know, shorthands DEI to equity and leaves out the word inclusion, that meaningfully changes things. And I don't know if you're trying to signal that you don't agree with the definition of DEI. I'm not trying to signal that. I think we were just using the language from the executive order, which said equity. The direction. So Mr. McDonald's declaration, for example, is very clear that he targets he's looking at grants that focus on DEI inclusion. He uses the word inclusion. Yeah, it's directional. So I'm trying to figure out if that is a point of contention here. It doesn't seem to be given this record. It's not a point of contention. I'm not disagreeing with that. What I'm trying to suggest is that's the same thing as saying we're not going to fund pro smoking advocacy or pro smoking research. If that's the point of contention, then let's move to that. Because I think the way the executive orders were implemented, it seems to me to be very clearly focused on DEI, the inclusion part, which is viewpoint is directional. And we can talk about that if you want. But I'm just relying on the definitions that we talked about last time, which is why it's important to me. And I want to give you an opportunity to explain the government's position on this, sir. That's why it's important to me that these programs were not terminated. Instead, selective grants were terminated within those programs based on DEI, which is a viewpoint. So let me try to I understand your question. I think let me try to explain it. The programs here are pretty broad, selective grant programs on general topics like for the EPA, the environment, right? For any age, it's very broad humanity. So you have this broad program of we're going to select grants and fund them on a competitive, selective basis. It's not all comers. We're going to give money to everybody. It's selective. So if you have a selective grant program, you can discriminate based on viewpoint. When you're choosing, I'm going to fund this one and I'm not going to fund that one. On this point, I think your brief relies on Finley. And this is the distinction between Rosenberger and Finley. Is that correct? Yes. OK, so I think you think the distinction between those two is whether there is a competitive process or not. That is what Finley said in distinguishing Rosenberger. Actually, if you keep reading and read all of Finley, I think this really comes to the nub of it. So I'm very anxious to hear your response to this point. I think if you read if you keep reading with Finley, what they what the Supreme Court tells us there is that that was it's the nature of the challenge at issue in the case that distinguishes the cases. Or that dictates the outcome there. So there's two parts of Finley, Your Honor. One, there's one part that says, you know, the Ninth Circuit, the Supreme Court is saying the Ninth Circuit applied Rosenberger and they say that's wrong because Rosenberger was a limited public forum case. This is not a limited public forum because it's competitive. Right. And therefore, Rosenberger doesn't apply. So it's the same. I think Finley corrected the same error about the reach of Rosenberger as we're dealing with here. So you don't draw any distinction. What about forgive me for interrupting? I thought you were delay. There's a bit of a delay. Forgive me. But the distinction I think the Supreme Court calls out there is whether there's an as applied challenge. And Finley goes on to talk about if we had an as applied challenge. In other words, Finley doesn't say that it's impossible to violate the Constitution if the grant selection process is competitive, right? It does not say that. No, it doesn't say that. And I think the way I understand that paragraph, which is the language of after distinguishing Rosenberger, there's language saying, of course, this doesn't mean we're not saying you could never violate the First Amendment by suppressing, leveraging and so on. I understand that to mean what the Supreme Court later explained in USAID. And I would suggest the court look at USAID. That's from 2013, and it draws a pretty clear line in USAID. The government said you can have these money. You have these funds. You cannot use them to promote prostitution. And you've got to commit that you're going to be opposed to prostitution generally. And the Supreme Court said the first part is fine. It is viewpoint discrimination, but it's fine because it relates to the use of these government funds. What you cannot do is leverage that to influence speech beyond the scope of what you're funding. But that line of cases is not applicable here, right? It's not implicated here. That's not what the government was doing. I agree. And I think that leveraging that USAID is talking about is what the Finley dicta is. That's the only way to understand the Finley dicta, because I've got Finley right in front of me, and you and I had this conversation a few months ago. So I think if you just keep reading, tell me what I'm missing about this. When you flip over to page five, you want to read from 586, I think, and I'm reading from 587. Thus, we have no occasion here to address an as-applied challenge in a situation where the denial of a grant may be shown to be the product of invidious viewpoint discrimination. If the NEA were to leverage its power to award subsidies on the basis of subjective criteria into a penalty on disfavored viewpoints, then we would confront a different case. You and I have talked about this several times, but why is this not a problem for the government here? So first of all, Finley was saying we're not addressing that. So it is dicta in Finley. If you read that language in Finley to mean that any time the government engages in viewpoint discrimination in funding grants in a selective grant process, then you've swallowed the rule of Finley. I don't read it that broadly, but I do think that you're to say that because this is a competitive grant selection process, the government is good to go. Yes, with respect, as long as you are only limiting what the funds can be used for and not going beyond the scope of the program, because I think otherwise USAID would have come out the other way, too. I think you've answered my question, and I appreciate the clarification. Mr. Roth, can I just follow it up just a little bit? As I understand your argument, there's no distinction between the initial decision to fund and the situation that these grantees, these researchers are in, the plaintiffs are in now, which is a termination of their grant. In your view, same thing is going. Same things are taking place. First Amendment standpoint, yes. Okay. Even though they terminate, they're terminating grants because they further or they promote or whatever DEI. Right. I think my position is. Why isn't that a penalty? I mean, why aren't you trying to suppress and penalize speech? It's not a penalty, and it's not a suppression. It's a decision not to continue funding. And if you can make that decision at time A, I don't understand why the First Amendment would say you're no longer allowed to make it at time B. Can I stop you right there? That's another premise. Forgive me. But I think I have a follow up to Judge Pius's point, which is the government repeatedly makes this point that you're making now, that because the grants were awarded on the basis of DEI, they can be discontinued on the basis of DEI. But we don't have evidence in the record that shows us that these grants were awarded because they mentioned DEI. There's a whole host of factors, as there would be in any grant application processor. So what's the basis for the position that you just took in response to Judge Pius's question? I'm just making a legal point that if it's permissible, as we maintain it is, and for the government to say we're going to fund anti-smoking but not pro-smoking grants, then a new administration can come in and say, actually, going forward, we're changing our mind about that. OK, so that elides the question. That elides the question. Let me just try this one more time. We've already established there was no program that was terminated. And in response to Judge Pius's question, you're now arguing that since these grants were awarded on the basis of DEI, they can be terminated on the basis of DEI, which seems to liken it to a program. We don't know. Here's the point. We don't know that these grants were awarded on the basis of the fact that they mentioned DEI. There was a whole host of criteria. So what is the basis for your assertion that they were awarded because they mentioned DEI? Your Honor, I'm not making a factual claim about why they were initially funded. I'm making a legal argument that it is permissible for the government to discriminate based on viewpoint when it initially awards grant money. And that's why it can say I want to fund one side and not the other side. If that is true, then I don't see any First Amendment distinction between that and a decision to terminate the funding on the same basis. Can I ask a follow up in this particular case? Not just a hypothetical. Does it change anything that the enabling legislation requires that in selecting individuals for these grants, the chairperson shall give particular regard to scholars and educational and cultural institutions that have traditionally been underrepresented? That relates to their statutory claim. I don't think it makes a difference for their First Amendment claim from the First Amendment standpoint. Viewpoint discrimination is permissible at the time of the initial funding. And if it's permissible at the time of the initial funding, it's also permissible for a new administration to change that in a prospective way. And that's why, for example, if the current administration entered a bunch of grants to study the benefits of gun ownership, 10 year grant to study how great guns are and the new administration came in, they could terminate that and say, we're not interested in funding pro-gun research anymore. Going forward, those are terminated. That would not violate the First Amendment. OK, I'm going to stop you because we've taken a whole lot of your time, and I want to just make sure you're seven minutes over. But I want to make sure that Judge Pius and Judge Desai got their questions answered at this point. OK, so you're seven minutes over. That's our fault. I want to thank you for your patience with our questions. When you can plan that when you come back, we'll put four more minutes on the clock for rebuttal. You bet. Thank you. We appreciate your advocacy. We'll hear from the, there he is. Mr. Chemerinsky. Good morning. May it please the court. Merwin Chemerinsky, representing plaintiffs. This case presents an issue of profound importance. May the president terminate billions of dollars of grants without any semblance of due process, with little explanation, and often based on the perceived viewpoint of the research. To a large extent, the issues that are before you now were resolved in your August 21st order and opinion. For the sake of clarity, there are three sets of issues on this appeal. One are the jurisdictional questions. The second are the merits questions about the Administrative Procedures Act and the First Amendment. And then the final set of issues go to the balance of equities in the injunction. In terms of the first issue, jurisdiction, undoubtedly the most important question concerns whether the Tucker precluded the district court from accessing jurisdiction. At the outset, I want to be clear, this doesn't apply to the First Amendment claim, the equity termination class. Mr. Roth conceded in the argument on July 31st, they were not making a Tucker Act argument with regard to the First Amendment. The petition for rehearing and rehearing on bond only uses NIH relative to the form termination. Also, now as to the form termination class. Your honors, this issue is resolved for this panel by the Ninth Circuit's decision in Community Legal Services for the United States Department of Health and Human Services, and specifically at 137 at 939, the Ninth Circuit resolves these questions. The Ninth Circuit said explicitly that the Tucker Act precludes jurisdiction only where the Court of Federal Claims would have jurisdiction. If the Court of Federal Claims has no jurisdiction, then there's no preclusion of the district court. And Mr. Roth conceded this morning that the Court of Federal Claims would not have any jurisdiction in this case. His position then has to be that no court would have jurisdiction, and he said that. But again, this court addressed that exactly in Community Legal Services. Sir, I don't think that we did direct that exactly in Community Legal Services, and I don't mean to spend a lot of time on this because I think it's been pretty well aired, but the claims there were statutory. I think what we said there, for me, the pressure point was they didn't arise from a contract. But Your Honor, I remind you of the language of 939, but there cannot be exclusive jurisdiction under the Tucker Act if there is no jurisdiction under the Tucker Act. And the court said the result requested by government would mean that no court has jurisdiction to the plaintiff's claims. Not only is this result contrary to common sense, but it also conflicts with the strong presumption draping judicial review under the APA. I'd also point you to the language from the October 10th opinion by Judge Fletcher and Judge Coe in Community Legal Services, where they say, quote, we therefore reject the two sovereign immunity waivers. The Tucker Act of the APA created jurisdictional catch 22, which no court can consider plaintiff's claims. And Your Honor. Go ahead, Dean. All I was going to say is it makes sense that the Tucker Act only precludes jurisdiction in instances where the court of claims would have jurisdiction. Mr. Roth's position. Can I just follow up? That's because you're assuming that some court has to have jurisdiction, is that it? Yes, Your Honor, I am. I'm assuming that if there's going to be a preclusion of jurisdiction, the United States Supreme Court has said it must be explicit. It can't be inferred. So what about opposing counsel's response to my colleague's question about this? And what he said is, well, these plaintiffs don't have standing to challenge. Your Honor, there's no case that says that because somebody else could sue plaintiffs who meet the Article 3 requirements for standing or denied people to sue. Consider the following. Under Mr. Roth's approach, what if a presidential administration said we're going to terminate all grants to African-American individuals? Now, the university could sue on their behalf, but if the university doesn't sue, that would then mean that no court would have jurisdiction to hear their claim. And the Ninth Circuit and Community Legal Services explicitly said there is such a strong presumption for judicial review, including under the Administrative Procedure Act, that if the government is going to preclude jurisdiction, it has to be  It can't be inferred in a situation like this. Can I just ask you about the Supreme Court's decision in NIH? So as I read that case, I think it's a little bit more pertinent here. And it's pretty clear that the court seemed to say that these claims, the APA claims, are essentially a contract claim and they belong in the court of  Your Honor, and the court sort of chastises all the lower courts for not heeding their views, even on these stay orders. So how do we deal with NIH? I mean, we can't just dismiss it. It's a higher authority than Community Legal Services. Of course, Your Honor, but NIH does not deal with the situation of this case of plaintiffs who could not go to the Court of Federal Claims. There is nothing in NIH explicitly or implicitly that discusses individuals who could not go to the Court of Federal Claims. The assumption of NIH is that the plaintiffs in that case could go to the Court of Federal Claims. Or to put it another way, Judge Pius, there's nothing in NIH that suggests that there would be a situation where there'd be complete preclusion of jurisdiction and the Supreme Court accepted. In order for NIH to be applicable, the court would have needed to address this situation, and it doesn't discuss it in any way. So the Court of Federal Claims has very limited jurisdiction, as I understand it. Is that right? I mean, it's likely that the plaintiffs would have constitutional standing. But could the Court of Claims entertain the relief they're seeking? Well, no, Your Honor. The Court of Federal Claims could not provide the relief that is being sought here. What about third party? Could they allege a breach of contract claim as third party beneficiaries? Except that the United States has specifically said that the plaintiffs cannot sue as third party beneficiaries if they're not in privity. If you look at Docket 35- Are they stuck with that point? Well, they've never deviated from that point. And I think, Your Honor, if you would look at the law with regard to third party beneficiaries in privity in the Court of Federal Claims and under the Federal Circuit, we would not have plaintiffs who are in third party beneficiary status or have privity of contract. I think the government was right in what it said. And it's based on the authority that they cite. Well, the Court of- My reading of the law on third party beneficiary status is it is available in the Court of Claims and only very, very narrowly. That's correct, Your Honor. And what the government argued at the citation I gave you is that the plaintiffs are not third party beneficiaries and they have no privity. And the government cited authority for that. And we agree with that authority, which is why the plaintiffs could not go to the Court of Federal Claims. How do you understand Judge Barrett's concurrence? Because I thought on this point, she seemed to just hedge a bit. She assumed that the parties could go to the Court of Claims. Is that right? That's exactly right. She assumed that the parties go to the Court of Claims, which is why neither her opinion nor the opinion of the court remotely addresses this issue. If you have plaintiffs who can't go to the Court of Federal Claims, does the Tucker Act preclude jurisdiction? Dean Chemerinsky, I would agree with you that the court does not address the specific issue of the class of plaintiffs who are researchers where they would have the ability to bring their claims. But you would agree with me that the plaintiffs in the NIH case included non-grantee researchers, correct? So the court had a class of plaintiffs before it that at least a subsect, which were the same as this case. And in fact, in your prior briefing, you characterized the NIH case as being nearly identical to this case. And so I'm now sort of having some difficulty with your distancing from NIH when, in fact, the plaintiffs in that case did include some of the very kinds of plaintiffs we have here. Let me divide your question into two parts. The first is, what did NIH discuss? NIH did not discuss at all in any way the individual plaintiffs. In fact, if you look at the briefing before the Supreme Court in NIH, if you read the decision, it simply doesn't discuss the individuals who wouldn't have access to the Court of Federal Claims. Everything about the opinion, and as I just said, Judge Barrett's opinion assumes that the Court of Claims has jurisdiction. And as we know, preclusion of jurisdiction is never inferred. It always has to be explicit. The second part of your question goes to our characterization of NIH. Of course, there are similarities between this case and NIH because both involve termination of grants. But the Supreme Court's decision in NIH on August 21st doesn't in any way address this situation, and that's plaintiffs couldn't go to the Court of Federal Claims. Your Honor, how could it be that the Tucker Act precludes jurisdiction where the Tucker Act doesn't apply? Mr. Roth says it wouldn't make sense to allow the individuals to sue where the institution couldn't sue. It does because they meet Article III standing. As this Court has found, they are tremendously injured by the cutoff of grants. Their research has to stop. Their labs have to close. They have to lose their postdocs, graduates, students, employees. Papers aren't published. It's caused by the government's action, and it'll be redressed. And since they meet Article III standing requirements, they can come to federal district court, even if there's another party that might have to go to the Court of Federal Claims. The second set of issues go to the merits, and the discussion so far with Mr. Roth is focused on the First Amendment. And here I think what Mr. Roth wants to do is simply ignore what the Supreme Court said in Finley, in Rosenberger, in Regan with taxation with representation. There's no doubt that the government can decide what programs to create. There's no doubt that the government can decide what speech to fund. But what the government cannot do is use its leverage with regard to funding to punish particular ideas, to act to censor ideas. And I know there's a lot of discussion. Judge Kristen's question was too long. But I'm a reminder of the language, Menier versus Finley, at 524 U.S. at 587. Even in the provision of subsidies, the government may not aim at the suppression of dangerous ideas. The government cannot leverage its power towards subsidies on the basis of objective criteria and a penalty on disfavored viewpoints. I'd also remind this Court of the Ninth Circuit precedent, the Koala versus Cosa, 931 F 3898. The government can violate the First Amendment by withholding benefits with censorious purpose. In your August 21st order, especially pages 21 and 22, you describe how that's exactly what the government was doing. If you look, for instance, at 90 Federal Register 8633, the government says its goal is to, quote, combat and end the dangerous, demeaning, immoral DEI speech. What the government did was engage in keyword searches. And if there were diversity or environmental justice appeared, they cut off the grant. As I said to Judge Desai at the July 31st hearing, this certainly shows a violation of the Administrative Procedures Act. Grants were cut off because they were about plant diversity, about diversity of the human stomach, and it was present there in terms of the biogeome. And this also violates the First Amendment, that it's entirely about trying to cut off grants on the basis of the viewpoint expressed. It's not about the government choosing what programs to fund. It's not about the government deciding what speech to fund. May I ask you a follow-up question there? Forgive me for interjecting, but in response to the order we previously issued, the government has come back. And when we talk about the juxtaposing in Rust and particularly Rosenberger and Finley, you heard the exchange a minute ago where the government decides that the distinction is whether or not that there's an all-comers policy. You know, of course, one of the cases, I think Judge Pius actually authored one of them, having to do with student activity funds, all-comers policies versus a competitive process. And I don't read Finley that way. There's another distinction in Finley, which is whether or not that was an as-applied challenge. In other words, there's subjective criteria to be sure, but the court didn't have the type of challenge. It had a facial challenge there. And so I draw the line there, but I'd like to hear what you have to say about whether both distinctions are made in the case. So how would you distinguish the two? Yes, Your Honor. I think the key is that the government can't choose to terminate grants just on the basis of viewpoint. I think what Finley is important is saying that of course the government can choose what programs to fund or not fund, what art to fund or not fund in that. But the government shouldn't be able to leverage its authority to censor particular ideas and views. Okay, so first of all, opposing counsel has conceded there were no programs that were terminated here. There's selective grants that were terminated for one criteria. And I think the McDonald Declaration makes very clear what the criteria was. So we've talked about that, but opposing counsel has now had a chance to respond to our order. And he says that because these grants were allocated, they were awarded in part because of DEI, they can be terminated because of DEI. Do you wanna speak to that, please? Sure, Your Honor. The government can make choices about what programs it wants to fund or not fund, but the government can't leverage its power to then try to censor particular ideas. That's almost verbatim what Finley and Reagan and Rosenberger say. And it's what the government did here. They weren't terminating programs. They were terminating specific grants because they disagreed with the viewpoint expressed. And that's exactly what this court said in its August 21st order, violates the First Amendment. So does your view of the case pivot in part on the fact that these were previously awarded grants as opposed to going forward, could the government decide that they're gonna change the criteria for awarding grants? Yes, Your Honor, the government can make choices as to the future of what programs to create or not create. But you're using, excuse me, you're using the word program there. Yes, Your Honor, the government, we're focusing on the programs that the government created, but in terms of the specific grants, the government can administer its program in the future. But here what the government is doing is quite different than that. The government is saying there are viewpoints that we find unacceptable, and we're gonna terminate particular grants for those viewpoints. There's no way to reconcile. Please, go ahead. I was just gonna say, there's no way to reconcile that with the language of Finley or Rosenberg or Reagan or what this court said in its August 21st order. Well, you know, from my August 21st order, I tend to agree with you. I'm really struggling with this though, and I wanna make sure that I'm understanding because we're in the unique position to hear the government's response, which I find very helpful. It's a really important case. And so we, of course, push back. In this case, in response to your comment that the government going forward could make this decision that a criteria can't include DEI, I don't even know if that's correct. And admittedly, we don't have to really reach that today, but given the enabling legislation where Congress specifically directed that these historically excluded groups have to receive particular weight in their grant applications, that seems to be even more dubious to me. Well, I'll agree totally with you on that, Your Honor. What I would say there is, there's a violation of the statute if the agencies don't do that. Right, right, right. You don't have to reach the question in this case of- Yes. What can Congress do in the future? There's no way to reconcile Mr. Roth's position with the language of Finley and Rosenberger and Regan, because what he's saying is the government just can't keep people from other speech apart from the program. But that's not what those cases say. I think we all agree those cases don't apply here. I didn't really hear the government to be arguing otherwise, but I appreciate your response. Judge Pius, did you get cut off, please? No, no, no, no. I just, but I do have a follow-up question here. With the First Amendment claim and the showing that you made on the First Amendment claim, would that by itself support the scope of the preliminary injunction? It would support the scope of the preliminary injunction with regard to the equity termination class. So when the district court crafted two separate classes, you don't have any quarrel with that? Not at all, Your Honor. As you said, they're overlapping classes. There are certainly members of faculty and researchers who fit within both of those classes. So in order to uphold the injunction fully, we would need to say that NIH can be, is distinguishable, doesn't apply here, and essentially adopt your arguments. Is that right? Yes, Your Honor. There's no issue with regard to NIH relative to the First Amendment class. The only issue is with regard to the form termination class. And I don't think there's any way to reach, read NIH is dealing with the issue that's presented before this court. The other aspect of NIH that I wanted to talk about concerns the balance of equities. And I think it's important here that it be thought of as a balance of equities. In terms of the harm to the plaintiffs, we have to start with the First Amendment harm to them. And there was no First Amendment claim in NIH. And the loss of First Amendment rights is an irreparable injury. Also, we've talked about the tremendous harm to the researchers in terms of their research being stopped. Giving them money in a few years isn't gonna resume their research or make up for what was lost. And also, as this court said, in its August 21st order, there's the harm to the federal government that comes in terms of interrupting the research. On the other side, there is the government's claim that the federal government couldn't recoup its money. But here, where it's University of California and the state of California, there's no reason to believe that the federal government couldn't be able to get the money. If it's about mechanisms, it could be just an unjust enrichment claim. And that makes this very different from the NIH case. Anything further? Thank you so much. Thank you for your advocacy. We'll hear from the government. I'm sorry if I forgot. I'm not trying to interrupt you, sir. I just want to apologize in advance. For some reason on your end, I keep having a delay. Like a long-distance phone call in the old days. But I'll try to not step on top of you. No problem, Your Honor. Thank you for the court's indulgence. On the Tucker Act, counsel said, you know, a preclusion has to be explicit, not implied. But 702 of the APA specifically says, if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought, this whole line of cases is about implied preclusion from an alternative review scheme that may grant certain relief, but not other relief. Or as relevant here, grant relief to some parties, but not other parties. Counsel said, no case supports the idea that if certain parties can sue, then other parties can't. That's literally what Block was about. Block was a case where Congress had authorized certain people to challenge these milk orders. And plaintiffs who had Article III standing, but were not within the scope of that defined class, tried to go under the APA instead. And the Supreme Court said unanimously, no, you can't do that. That's evading the limits that are in the specialized review scheme. It's the same argument as here. And so, you know, I think it's just kind of backwards to say the parties of the contract have no ability to get specific performance. Intended third-party beneficiaries, no ability to get specific performance. But if you're even further removed, such that you don't even count as an intended third-party beneficiary, then you can go to district court and get the grant reinstated. That is a very, very strange result. And I don't think it's consistent with the law. With respect to the First Amendment, I would just urge the court to take a look at Judge Harris's concurrence in the Fourth Circuit case, National Association of Diversity Officers. Court granted a stay in that case, and Judge Harris wrote a concurrence where she said, she was talking about the executive order that requires termination of equity-related grants. And she said, well, that doesn't seem to be a First Amendment problem because it's limited to the use of the funds and doesn't purport to influence, suppress, or compel any speech outside the scope of what's being funded. And that I think is correct. And that's sort of the basic point that I'm trying to articulate here. I don't fully understand the difference between the program and grant idea. As I understand it, Congress has created these programs. The agencies can't terminate the programs, and they're not trying to. Congress creates the broad program and says, here's a billion dollars for grants for health. And then the agency decides how to allocate that money. We think in an unreviewable way, at least on statutory, from an APA perspective. And in allocating the money to specific grants within that program, the agency is permitted to discriminate based on viewpoint. And that's why it can say, we want to fund pro-choice research and not anti-abortion research or pro-gun or pro-smoking or anti-smoking. There's no requirement of viewpoint neutrality in making those decisions. And if the agency can do that, then I don't understand why the First Amendment would prohibit a new administration from prospectively no longer funding particular viewpoints that it no longer wishes to subsidize. It's not a penalty. It's not a punishment. It's not suppression. It's simply the government not paying for research it doesn't want to pay for. And that's really our fundamental point. If the government doesn't want to pay for DEI-related research, the First Amendment doesn't require that. And that requires the reversal of the injunction because the injunction actually enjoins any termination of a grant pursuant to this executive order. So it's- To use a silly, dramatic, hypothetical, what is your answer to Dean Chemerinsky's question? I think it's posited in the briefing somewhere. If a new administration were to say something truly outlandish, we're not going to fund any more art if the artist is of a particular ethnic minority. Well, there might be an equal protection claim if it's discrimination. And I think counsel made that point as to the Tucker Act. He said, well, what if they stopped funding Black researchers? Only the universities could sue. But remember, we've only made here, we've only raised the Tucker Act argument in response to the APA claims. So, but I don't think it's a First Amendment problem. I think it might be an equal protection problem. And you think would only be an equal protection problem? Yes, I think that's right. And so for that reason, we'd ask the court to reverse the injunction. Happy to take other questions if there are. Yes, before you leave the podium, let me just check with my colleagues. Any further questions? No. Thank you so much for your advocacy. Both of you, I can't see Dean Chemerinsky at the moment, but I want to thank both of you. We appreciate your help very, very much. It's an important case, and we appreciated all of your help. We'll take another advisement and give you an opinion as soon as we can. We offer you today.
judges: PAEZ, CHRISTEN, DESAI